## Moore v. The Lighthouse

*J. V. Furlong,* for plaintiff.
*Arthur Makadon,* for defendants.

TAKIFF, *J.*, August 4, 1977—This matter came before the court on plaintiffs' motion for preliminary injunction and, by stipulation, the testimony then taken was received as on final hearing.

The thrust of the relief sought is the restoration of the complainants as members of the Recreation Committee and of the Board of Directors of The Lighthouse, a non-profit corporation. The facts underlying this regrettable controversy are essentially embodied in a series of stipulated documents from which we derive the following

## HISTORY

The Lighthouse has a long and distinguished history of community service in Philadelphia, particularly serving the recreational and social service needs of the residents of Kensington. The corporation is organized on a non-stock basis so that the persons who comprise the board of directors charged with the management of the corporate affairs are also the sole members of the corporation. Funds for the conduct of numerous activities are derived as follows: Of the total annual budget of approximately $814,000, The Lighthouse receives $231,000 as a participant in the United Way comprehensive fund raising campaign, $7,500 from dues and fees from persons who participate in the programs and use the facilities of The Lighthouse, and the balance from foundations and governmental sources.

Over the years there has developed a well motivated but nonetheless intense competition between those whose primary interests were focused on social service programs and those interested in the recreation activities—with special emphasis on athletic programs, particulary soccer. This dichotomy was reflected in competition for budgetary allocation as well as management and directoral power. This rivalry fulminated about 1972 to a

point which prompted intercession by a member of City Council, Councilman Harry Jannotti, and representatives of the United Way (then United Fund). As a result of a series of meetings then held, various tentative agreements were reached, initially embodied in a memorandum of agreement dated May 16, 1972, and finalized by action of the board of directors at a special meeting held on May 25, 1972, with appropriate implementing amendments to the by-laws of the corporation thereafter enacted. The present conflict essentially turns on differences of interpretation of the agreement then reached: Were the several interests of The Lighthouse, identified as the social service department and the recreation department, autonomous bodies functioning thereafter without ultimate control in the board of directors or were they subject to the board?

The current eruption of conflict developed sequentially as follows:

Some time prior to August 1976, as had apparently occurred on several previous occasions, a group of youngsters then playing soccer as a team known as Cathays, together with their manager, saw fit to play under the aegis or sponsorship of some other organization in an inter-county league. Letters were addressed to the parents of the 13 children advising of a recreation committee ruling that "any boy who leaves Lighthouse, in a team unit, to play for another organization will be barred from all future Lighthouse Boys' Club programs." In a proceeding initiated at a meeting of the soccer grievance committee and confirmed and reconfirmed at several meetings of the recreation committee, the children and their manager were so barred in accordance with the cited ruling. Concerned parents

solicited the consideration of the board of directors to review and modify this action. An ad hoc committee of the board was equally divided on the underlying issue of the right or power of the board of directors to review a decision of the recreation committee, based upon the claim of autonomy purportedly vested in such group. This impasse was inferentially resolved at a meeting of the board of directors held on November 10, 1976, when it voted to *uphold* the decision of the recreation committee. That action would suggest that the board then asserted its underlying power to review the action of the recreation committee and, in the exercise of that power, approved the action. Various references in the subsequent minutes of the meetings of the board of directors suggest ongoing concerns and challenges within the community to the consequences of the recreation committee's ouster of the Cathays.

At a meeting of the executive committee of the board of directors the following resolution was adopted for action by the board of directors at its regular meeting of April 13, 1977:

"Be it resolved that as a United Way Agency all sports and recreation activities of The Lighthouse are open to all residents of The Lighthouse service area and no team member or coach will be penalized or prohibited from participation in Lighthouse activities because of his or her participation in teams or programs of other organizations in or out of The Lighthouse service area; and any such penalties previously imposed are hereby rescinded [sic], and the aggrieved persons are now eligible to participate in all Lighthouse activities."

The denouement developed swiftly. The chairman of the recreation committee, being a member of the executive committee, expressed "disappointment" and withdrew from the meeting. The board of directors adopted the challenged resolution at its April 1977 meeting, after a charge had been asserted to the office of the Attorney General of the Commonwealth of Pennsylvania that The Lighthouse was failing to operate in accordance with its non-profit charter, its charitable purpose and its by-laws, inter alia, by barring children "from participation in Lighthouse programs because of their participation in outside programs and activities." At the meeting of the board, however, the tocsin signaling the present litigation was sounded when the chairman of the recreation committee requested the minutes of that meeting explicitly note the recreation committee "will not carry out the directives of the board."

Subsequent efforts at conciliation to resolve the differences thus openly voiced between the majority of the board of directors and the recreation committee, whose members were the minority members of the board, were unavailing. The recreation committee persisted in its refusal to implement the directive embodied in the foregoing board resolution. At a meeting of the executive committee held on May 16, 1977, it was recommended that a provisional committee be created and empowered to administer the recreation department until such time as a representative, permanent committee could be elected. Such a committee was thereafter appointed by the president, the previous recreation committee was notified that it had been replaced and these actions were ratified and confirmed by the board of directors at its meeting of June 8, 1977.

At the same time the board adopted a resolution that "the recreation committee, as formerly constituted, is so suspended" and the named members of the board, in their capacities as members of the recreation committee having "refused to implement the policy and program directives of the board of directors . . . pursuant to authority vested in it by section 4.02 of the By-Laws and the Pennsylvania Non-Profit Corporation Act, the board of directors hereby declares that the above named individuals are removed as members of the board of directors . . ."

The activities of the recreational committee have been under the aegis of the provisional committee. The nominating procedures for candidates to fill the vacancies created on the board of directors by the removal of the "recreation" directors have been initiated. However, nine of the recreation committee members of the board of directors have filed this complaint in equity, asserting full and complete autonomy in the recreation committee in the conduct of all phases of the recreation program with the associated denial of the right or power of the board of directors to rescind any action or ruling by the recreation committee or to remove the said committee or the recreation members of the board of directors. These complainants seek reinstatement as board members and as members of the recreation committee and the termination of the interim provisional recreation committee.

## DISCUSSION

Persons of good will and interest, deeply committed to their respective philosophies and objectives to serve young people and a total community, have

become embroiled in an unfortunate conflict. The most regrettable implication of this internal struggle is the possibility that, to the slightest extent, the illustrious history of The Lighthouse should be tarnished, or the significant service it has and does render be impaired.

An issue of the rawest sensitivity, underlying the presently challenged action of the board of directors in removing plaintiffs as members of the recreation committee and as members of the board of directors, is the claim of "autonomy," allegedly predicated upon the conciliation agreement of May 18, 1972. The simple fact of the matter is that whatever the aspiration of the recreation and social service program supporters may have been, they did not, and, under the law, could not achieve an independence of action and authority tantamount to separate corporate entities "spun-off" from a parent save for a fragile fiscal and administrative umbilical cord, but without the birth pains of creation and organization as provided under the Non-profit Corporation Law or subject to the control and accountability mandated by that law.

The issues are not complex; only the emotionalism of the well-intentioned antagonists make it appear so. Lighthouse, like so many community agencies, for years has struggled to achieve and contribute more than its fiscal capability could provide. Within the organization, therefore, there must have developed a competition for the allocation of the available funds and a correlative challenge as to the relative importance, and hence entitlement, by the sponsors of the various projects and programs. Is recreation more, less, or equal in importance to social service and therefore entitled to more, less or equal allocation of the funds provided

by United Way, foundation and governmental grants and membership fees? These inquiries do not appear in these words and yet they are implicit in the ten paragraphs of the memorandum of agreement of May 18, 1972, sometimes referred to as the Jannotti agreement, as the parties to that negotiation struggled to resolve the competing interests and attain a balance that represented equity. "Autonomy" was the catch word used, but it was not that freedom and independence which attaches to separate corporate entities. Rather, separate departmental existence was to be established, the members of which were to be appointed by the president, given autonomy in conducting their respective programs "but both responsible to the overall board." (Meeting of the Board of Directors May 25, 1972.) It was this relationship and the accompanying restricted degree of autonomy, which was thereafter woven into the fabric of the by-laws.

"Complete" is the key word in the by-laws' exposition of the powers vested in the board of directors (section 4.02) when it declares "The Lighthouse shall be managed by the Board of Directors, which shall exercise complete management of the affairs of the corporation, determine policy of The Lighthouse . . . " This provision reinforces and restates the basic thrust of the articles of incorporation which provide (Eighth) " . . . The persons constituting the Board of Directors of the corporation shall be the members of the corporation and may exercise all the rights and powers of members." It is only "subject to the ultimate authority of the Board of Directors of The Lighthouse" that the recreation and social service committees are respectively empowered to "coordinate, assist, and direct" these respective programs (by-laws, sections 6.02 and

6.03). Were the provisions of the by-laws otherwise, a serious issue of legality could be raised under the laws of this Commonwealth which compel that ultimate responsibility be retained and vested in the members of the board of directors who possess non-delegatable fiduciary duties and responsibilities, irrespective of assignments of responsibility to various committees: Act of November 15, 1972, P.L. 1063, 15 Pa.C.S.A. §7734. See also §7731(c).

Viewing the entirety of the by-laws, the historical antecedents and the development of events which led up to the resolution adopted by the board of directors on April 13, 1977, when it opened all sports and recreation activities to all persons, including those previously barred by the action of the recreation committee, it must be concluded that the challenged action was valid, lawful and within the power vested in the board.

This conclusion is fortified by the structure and design of the Non-profit Corporation Law which, in section 7731, defines the powers which may be vested in any committee created and empowered by the board of directors or the by-laws, including, all the powers and authority of the board of directors itself, "except that no such committee shall have any power or authority as to . . . (iv) The amendment or repeal of any resolution of the board."

The remaining issue, namely the legality of the removal of the members of the recreation committee from that committee and as members of the board of directors, requires further consideration. The by-laws address these matters only obliquely. Membership on the presently contested recreation committee must include "at least twelve members of the Board of Directors." (by-laws, sec. 6.02).

Conversely, the board of directors "shall consist of at least twelve members representing the Recreation Department" (by-laws, sec. 4.01). The chairmen of the various committees shall be appointed by the president and members of a committee "shall be appointed by the President in consultation with the committee chairman" (by-laws, sec. 6.08(b)). No explicit by-law provision dealing with removal of members of a committee have been brought to our attention or observed in our independent review of that document.

With respect to removal of directors, the by-laws contain an explicit provision in pressing automatic removal of any director who absents himself from three regular meetings in any year (sec. 4.08). Beyond this self-implementing process, and the further by-law provision dealing with filling vacancies on the board, which declares (sec. 4.10) "A vacancy on the Board shall be deemed to exist in the case of the death, resignation or removal of any director . . . ", no distinct reference to the manner or circumstances of removal is apparent in the by-laws. Power of removal of members of committees and of directors may be found implicitly in the previously quoted complete managerial powers vested in the board of directors by section 4.02 of the by-laws coupled with the hyphenated status of the directors as the only "members" of the corporate body under the articles of incorporation.

It is in this duality of status, possessing the powers of both directors and sole members of the corporate body, that the ultimate inquiry as to the lawfulness of the majority's removal of plaintiffs must be focused.

Removal of directors is the subject of several discrete sections of the Non-profit Corporation Law

currently in effect. Section 7726(a) deals with removal of directors "by the members"; section 7726(b) concerns the same subject "By the board." Both provisions are conditioned upon "unless otherwise provided in a by-law." As to removal of directors by the board, the specific conditions of mental incapacity, conviction of felony, "or for any other proper cause which the by-laws may specify" are stated. As to removal by "members," however, the statute specifies that a majority of these persons may remove the entire board, a class of the board, or any individual director "without assigning any cause."[1]

As to the removal of members of a committee, the statute addresses itself to this subject "unless otherwise restricted in the by-laws" in a negative fashion, i.e.: "Each committee of the board shall serve at the pleasure of the board" (§7731(b)). This reference is of only partial assistance in resolution of the problem, because while the recreation committee is specified in the by-laws as a mandated committee, here again the "membership" of the corporation acting as the board of directors have not abolished such a committee but have removed its members and replaced them by a provisional recreation committee, authorized to serve and perform the functions of a recreation committee until the next succeeding election of the board of directors. Further, looking at the recreation committee as either officers or agents of the corporation, the Non-profit Corporation Law provides that such

1. The statute (§7726(c)) also addresses removal of directors by the court upon petition filed, for specified reasons "or for any other proper cause," but no petition is presently before us.

persons may be removed by the board of directors ". . . whenever in its judgment the best interests of the corporation will be served thereby . . ." (Section 7733).

The reconciliation of these various principles is particulary troublesome where the corporate body is structured in a manner so that the entire corpus is a head only, with no articulating torso or limbs; the directors, officers and members are the same persons and their positions are self-perpetuating— except for death and a few exposures to removal or sabbatical rotation in office if their peers see fit to implement the provisions set forth for such purpose.

Clearly, mere dissension or disagreement is not and could not be a legally sanctioned basis for removal from either committee or directorship; that is so obviously repugnant as to require no elaboration. Conversely, however, a refusal to abide by and implement a basic conclusion openly reached by a majority of persons charged with the responsibility of management and accountability is itself an exercise of autocracy which cannot be submitted to supinely. Plaintiffs in this matter did not merely dissent or disagree; they declared their revolt and refusal to accept or follow the basic policy resolution adopted in good faith by the majority. By their actions, the minority plaintiffs could frustrate the conduct of the activities of The Lighthouse in a manner consistent with the will of the majority. Unless the conflict, so posed by the confrontation of plaintiffs, would be resolved by their removal from the recreation committee and the board, and the creation and authorization of a provisional recreation committee, the entire recreational program of The Lighthouse, vital to the children participants,

their parents and the community, could well have been at an impasse. Failure to proceed, as defendants did in fact act, would have been not dissimilar from the ancient western state statute which provided, in essence, "When two railroads approach at a right angle intersection, neither shall proceed until the other has passed." Movement there was, however, and, as we view the facts as reviewed and the applicable law, we reach the following

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and subject matter of this action: 15 Pa.C.S.A. §7783.

2. The Lighthouse is a non-profit corporation duly organized and chartered in the Commonwealth of Pennsylvania.

3. The provisions of the Non-profit Corporation Law of 1972 (the "1972 Act"), 15 Pa.C.S.A. §7301 et. seq. (as amended, 1972), and the charter and by-laws of The Lighthouse are dispositive.

4. The charter of The Lighthouse structures the corporation so that individual serving as director also constitute the membership of The Lighthouse "with all the rights and powers of members."

5. The board of directors had the final and ultimate authority to act with respect to recreation matters. The by-laws of The Lighthouse make it clear that the board never gave up its authority to so act. Under the laws of the Commonwealth the board must retain its ultimate fiduciary responsibility over all affairs of The Lighthouse, irrespective of any delegation to any committee: 15 Pa.C.S.A. §§7731(c), 7734 (as amended, 1972).

6. Under the Non-profit Corporation Law, section 7751(b):

"Where the articles provide that the corporation shall have no members, as such, or where a non-profit corporation has under its bylaws or in fact no members entitled to vote on a matter, any provision of this article or any other provision of law requiring notice to, the presence of, or the vote, consent or other action by members of the corporation in connection with such matter shall be satisfied by notice to, the presence of or the vote, consent or other action by the board of directors or other body of the corporation." 15 Pa.C.S.A. §7751(b) (as amended, 1972).

7. Possessed of the same powers as that possessed by voting members of a non-profit corporation, the board of directors possessed, inter alia, the right, upon majority vote, to remove any "individual director" or "class" of directors "without assigning any cause." 15 Pa.C.S.A. §7726(a).

8. The removal of plaintiffs as directors and the ratification of the suspension of the recreation committee was within the authority of the board at its June 8, 1977, meeting. Such meeting was duly called pursuant to timely notice, and a quorum, including all plaintiffs, was present.

Wherefore, we enter the following

## DECREE NISI

And now, August 4, 1977, after consideration of the pleadings, stipulations and oral arguments heard and request for findings of fact and conclusions of law submitted, it is ordered, adjudged and decreed that the complaint in equity be and is hereby dismissed and the prayer for relief submitted be and the same is hereby denied.

The prothonotary is ordered to enter this decree nisi and unless appropriate exceptions are filed by

either party within ten days from the date of notice of this order, to enter this adjudication as the final decree of this court.